UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

LISA EARL, et al.,

                Plaintiffs,

    v.

SCOTT CAMPBELL, et al.,

                Defendants.

CASE NO. C17-5315 BHS

ORDER GRANTING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AND
DENYING DEFENDANTS'
MOTION TO EXCLUDE,
DEFENDANTS' MOTIONS IN
LIMINE, AND PLAINTIFFS'
MOTIONS IN LIMINE AS MOOT

This matter comes before the Court on Defendants Scott Campbell ("Campbell")

and the City of Tacoma's ("City") (collectively "Defendants") motion to exclude

plaintiffs' expert witness Thomas Streed, Dkt. 25, motion for summary judgment, Dkt.

27, and motions in limine, Dkts. 63, and Plaintiffs Lisa Earl, I.B., K.S., K.W., O.B., and

the Estate of Jacqueline Salyers's ("Estate") (collectively "Plaintiffs") motions in limine,

Dkt. 61. The Court has considered the pleadings filed in support of and in opposition to

the motion and the remainder of the file and hereby rules as follows:

## I. PROCEDURAL HISTORY

On April 28, 2017, Plaintiffs filed a complaint against Defendants asserting claims

based on the shooting death of Jacqueline Salyers ("Salyers"). Dkt. 1. Specifically, the

Estate asserts an excessive force claim against Campbell, the individual plaintiffs assert substantive due process claims against Campbell, and all Plaintiffs assert wrongful death claims against Defendants. *Id.*, ¶¶ 58–84.

On July 5, 2018, Defendants filed a motion to exclude Plaintiffs' expert Thomas Streed and a motion for summary judgment. Dkts. 25, 27.[1] On July 23, 2018, Plaintiffs responded to the motion for summary judgment. Dkt. 40. On July 27, 2018, Defendants replied. Dkt. 45.

On September 13, 2018, Plaintiffs filed a motion to reopen discovery based on newly discovered evidence that supported an allegation that officers other than Campbell engaged in the spoliation of video evidence. Dkt. 48.

On September 24, 2018, the parties filed motions in limine in preparation for trial. Dkts. 61, 63.[2] On September 26. 2018, the Court struck the trial date and remaining deadlines. Dkt. 67. On October 4, 2018, the Court granted Plaintiffs' motion, reopened discovery, and set a supplemental briefing schedule for Defendants' motion for summary judgment. Dkt. 71.

---

[1] The Court denies the motion to exclude as moot because none of Mr. Streed's opinions are relevant to the issues on summary judgment. Moreover, the Court agrees with Defendants that the majority of his opinions are improper because they are irrelevant and intrude on the ultimate questions of law. For example, the issue of whether the officers should have waited for backup has no bearing on whether Campbell used excessive force.

[2] The Court denies these motions as moot because there will not be a trial on Plaintiffs' current claims.

On October 10, 2018, Plaintiffs filed a motion to clarify and/or expand the scope of reopened discovery. Dkt. 72. On October 22, 2018, Defendants responded. Dkt. 75. On October 26, 2018, Plaintiffs replied. Dkt. 78.

On November 21, 2018, Plaintiffs filed a supplemental response to Defendants' motion for summary judgment. Dkt. 84.

On November 28, 2018, Plaintiffs filed a motion for leave to amend the complaint. Dkt. 88.

On November 30, 2018, Defendants filed a supplemental reply in support of summary judgment. Dkt. 89.

On December 10, 2018, Defendants responded to Plaintiffs' motion for leave to amend. Dkt. 91. On December 14, 2018, Plaintiffs replied. Dkt. 92.

## II. FACTUAL BACKGROUND

On January 28, 2016, Campbell and his partner, Tacoma Police Officer Aaron Joseph ("Joseph") drove to the 3300 block of Sawyer Street in Tacoma, Washington because they received a tip on the location of Salyers and her boyfriend Kenneth Wright ("Wright"). Dkt. 29, Declaration of Scott Campbell ("Campbell Dec."), ¶¶ 5, 7, 8. The informant also provided information on a vehicle that Wright was recently seen driving and that Wright had numerous outstanding warrants for his arrest, including one for robbery and one for unlawful possession of a firearm. *Id.* ¶ 5. The officers arrived at the location at approximately 11:45 p.m. *Id.* ¶ 8. Once there, Campbell spotted a vehicle that matched the informant's tip and, inside the vehicle, he recognized Wright from booking photos he had previously viewed. *Id.* ¶ 8. Based on the submitted exhibits, the

suspect vehicle was backed into a parking spot on the opposite side of the street. Dkt. 27 at 4. Campbell confirmed with Joseph that Wright was in the vehicle. *Id.*

Joseph declares that he immediately reacted when he saw the suspect vehicle with Wright inside. Dkt. 30, Declaration of Aaron Joseph ("Joseph Dec."), ¶ 6. After this recognition, he "stopped [the] patrol car, jumped out, pulled [his] weapon and ran toward the suspect vehicle." *Id.* Joseph stopped the patrol car in front of Wright's vehicle such that the front of Wright's vehicle was pointed at the rear portion of the patrol car. Dkt. 27 at 4. Joseph "took up a position by the A-post of the vehicle, right next the vehicle, looking through the windshield and pointing my weapon at the occupants." *Id.* (the A-post of the vehicle is the driver's side front corner). Joseph declares that he was yelling at the occupants to show their hands, but they failed to comply. *Id.*

Meanwhile, Campbell exited the passenger side of the patrol car, which was the side furthest from the suspect vehicle, and moved toward the back of the patrol car. Campbell Dec., ¶ 9. Campbell noticed that Joseph was close to Wright's vehicle and that Wright was sitting in the passenger seat leaning over as if he was reaching under the seat. *Id.* Campbell drew his weapon as he moved across the street towards the passenger side of the vehicle. *Id.* Campbell's attention was on Wright in the passenger seat, and he was not focused on Salyers in the driver's seat. *Id.* ¶ 10.

At some point, Salyers began driving the vehicle forward. As the vehicle began to "creep" forward, Joseph struck the driver side window with the butt of his weapon in an effort to break the window. Joseph Dec., ¶ 9. Joseph remembers the next few seconds as follows:

As I was still striking the window, the car suddenly accelerated, turning southbound, away from me. The suspect vehicle accelerated rapidly enough that I heard the wheels spinning. Within a few seconds of the car accelerating, I heard gunshots and saw the muzzle flash from the gun. At that same moment, I saw Officer Campbell's silhouette, in front of the suspect vehicle near the passenger side.

*Id.*

Campbell recalls the events as follows:

When I was approximately 5-10 feet from the vehicle, at an approximately 45 degree angle off the front passenger corner of the car (and while I was still moving towards the car), the front end of the car lurched up and forward, as the car was accelerating, and the wheels turned directly towards me.

As soon as I recognized that the car was turning towards me, I immediately jumped back and started backpedaling (for the first couple of steps) as I made the decision to move towards the shoulder of the roadway. I shifted my feet and hips in the direction I was running, while keeping my upper body facing (as much as possible) towards the vehicle, and I began firing my weapon. I fired a volley of shots at the driver, without interruption, as quickly as I could while I moved towards the shoulder of the road. I shot at the driver in order to stop the driver from running me over; in response to my shots, the Lincoln started to slow. As soon as I realized I was out of the path of the Lincoln, I stopped shooting. I did not realize it at the time, but I had moved around the back end of a pickup truck that was also parked on the shoulder and had ended up on the shoulder of the road on the south side of the pickup. As the Lincoln rolled to a stop on the shoulder south of the pickup, I moved to the north side of the pickup to take cover.

Campbell Dec., ¶¶ 10–11.

Plaintiffs have retained multiple experts contesting whether Campbell was in the path of the vehicle and whether he was in a situation that justified shooting. For the

purposes of this order, the Court need only address the opinion of Ronald Scott ("Scott").

Dkt. 41 at 75–108.[3]  Scott opines as follows:

> **The scientific evidence does not support the version of events claimed by Officer Campbell.**
>
> Not a single one of the eight /8/ gunshots were fired from a location that would have been in front of the Lincoln.
>
> All the gunshots were fired from locations that place Officer Campbell off to the passenger side of the vehicle and this shows that the vehicle was not in imminent danger of striking him.
>
> Officer Campbell's claim that he stopped firing when the danger had ceased is inaccurate; **he was never in a position where his life was in danger** and certainly was not justified in using lethal force merely because the driver was passing him when he was off to the side of the passenger side of the Lincoln.

*Id*. at 96 (emphasis added).

During his deposition, Defendants attempted to undermine this opinion by offering a hypothetical in which Campbell was standing stationary in front of the vehicle.  The exchange proceeded as follows:

> Q. My question was, if Officer Campbell is standing somewhere in that rectangle as depicted in Mr. Newbery's supplemental report and that vehicle starts pulling forward on the arc depicted in Exhibit 9, is he or is he not in the path of that vehicle if he doesnt move?
> A. If he does not move?
> Q. Yes.
> A. He wouldn't be struck by the front of the vehicle, but I would say he would be very close to the side of the vehicle.
> Q. He would be hit by the vehicle, wouldn't he, Mr. Scott?
> A. I don't think he would because he was backpedaling at the same time the vehicle was moving forward. Your question is if he stayed there and didn't move, would he be struck by the vehicle? I think it's possible.

Dkt. 28-1 at 68–69.

---

[3] Unless otherwise noted, the Court refers to the electronic case file pagination, which is a header added to all documents electronically filed with the Court.

In response to another expert opinion, Campbell submitted an additional declaration. In there, Campbell declares as follows:

> Also, the animations show me running around the back end of the patrol car and up to the Lincoln and then stopping, as if I was taking up a position. This is not accurate. **As I testified in my deposition, I never stopped moving, from the time I exited the patrol car until after I stopped shooting.** Unlike the animations, I did not approach the Lincoln and then stop, as if waiting for the Lincoln to move. I was moving forward (towards the Lincoln) when the Lincoln started to pull forward.

Dkt. 47, ¶ 5 (emphasis added).

After Campbell stopped shooting, the car rolled to a stop a short distance from the officers. Wright crawled over Salyers, exited the vehicle with a rifle, and ran down an alley. The officers did not chase Wright because they were unsure whether he took up a defensive position in the dark alley to shoot the officers or if he continued fleeing the scene. When additional officers arrived, they were able to safely reach Salyers in the vehicle and performed CPR until medical personnel arrived. Campbell hit Salyers with four bullets, including a fatal wound to the right side of her head.

Regarding the alleged spoliation of video evidence, Plaintiffs have moved to add a claim for the deprivation of effective access to the courts against City police officers Scott Shafner, Jack Nasworthy, and Charles Taylor. Dkt. 88-1, ¶¶ 146–48. Plaintiffs allege that days before the shooting a City detective "placed a police surveillance camera up on a pole in the area of 3400 South Sawyer Street in Tacoma." *Id.* ¶ 66. It is undisputed that the camera was oriented in a direction that would have captured the events in questions. The parties, however, dispute whether the camera was able to capture video at night, whether it recorded any of the events in question, and whether any

officer deleted any video that was recorded by the camera. Plaintiffs have submitted

three declarations of Dr. Gordon Mitchell, an expert in the field of information security

systems. Dkts. 50, 70, 87. In the third declaration, Dr. Mitchell opines that it would have

been possible for an individual to delete video from the camera without leaving any

traces of the existence of the video or of the deletion. Dkt. 87, ¶¶ 4–9. Plaintiffs have

also submitted circumstantial evidence to establish that an officer was improperly given

administrative access to the camera and accessed the camera after the shooting.

### III.  DISCUSSION

Defendants move for summary judgment on all of Plaintiffs' current claims. The

Court concludes that Campbell is entitled to qualified immunity on the Estate's excessive

force claim, Plaintiffs fail to submit sufficient evidence to establish any substantive due

process claim, and Plaintiffs have failed to establish their negligence claims as asserted in

the complaint.

**A.    Summary Judgment Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material

fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

The moving party is entitled to judgment as a matter of law when the nonmoving party

fails to make a sufficient showing on an essential element of a claim in the case on which

the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole,

could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial—e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

**B.      Excessive Force**

Defendants argue that Campbell is entitled to qualified immunity from the Estate's Fourth Amendment excessive force claim. When confronting a claim of qualified immunity, the Court must consider two questions. The first question is whether the

officer in fact violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The second question is whether the contours of the right were "sufficiently clear that a reasonable official would [have understood] that what he is doing violates that right." *Id.* at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The Court may consider these questions in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

In this case, the Court will address the second question because it is likely that a question of fact exists on the first question. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). When considering whether a right was clearly established, the Court does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011). The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality," and instructed that the dispositive question is "whether the violative nature of particular conduct is clearly established." *Id*. at 742. The inquiry "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) (quoting *Saucier*, 533 U.S. at 201). "Such specificity is especially important in the Fourth Amendment context, where the Supreme Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Mullenix v. Luna*, 136 S. Ct. 305, 313–14 (2015) (quoting *Saucier*, 533 U.S. at 201). In other words, qualified immunity protects officers when their conduct falls into the "'hazy border

between excessive and acceptable force.'" *Brosseau*, 543 U.S. at 201 (quoting *Saucier*, 533 U.S. at 206).

In this case, the Court concludes that the facts taken in the light most favorable to Plaintiffs establish that Campbell's actions at most fall into the hazy border between excessive and acceptable force, entitling Campbell to qualified immunity. While Plaintiffs extensively brief the issue of Salyers's constitutional right, they spend a mere three paragraphs and a footnote on the issue of whether that right was clearly established. *See* Dkt. 40 at 25 & n.30. In that brief response, Plaintiffs advance an argument that has been explicitly rejected. They argue that the "the Fourth Amendment right at issue in this case has been clearly established since [*Tennessee v. Garner*, 471 U.S. 1 (1985)] was decided in 1986." *Id.* In *Brosseau*, the Ninth Circuit denied qualified immunity because the circuit found "fair warning in the general tests set out in [*Graham v. Connor*, 490 U.S. 386 (1989)] and *Garner*." *Brosseau*, 543 U.S. at 199. The Supreme Court held that the circuit was mistaken because *Graham* and *Garner* "are cast at a high level of generality." *Id.* Similarly, the Court rejects Plaintiffs' arguments that *Garner* provided fair warning to Campbell.

Plaintiffs also rely on *Zion v. Cty. of Orange*, 874 F.3d 1072, 1076 (9th Cir. 2017), *cert. denied sub nom. Higgins v. Zion*, 138 S. Ct. 1548 (2018), for the proposition that "the use of deadly force against a non-threatening suspect is unreasonable." Dkt. 40 at 25. As with *Garner*, Plaintiffs cite a principle cast at a high level of generality and unpersuasive in the context of these facts. More importantly, the facts of *Zion* would not put Campbell on notice that using deadly force in the situation he encountered was

improper. In *Zion*, the officer shot the plaintiff as the plaintiff was running away from a knife attack on another officer. *Id.* at 1075. The officer who shot the plaintiff then ran toward the plaintiff as the plaintiff lay on the ground following the first volley of bullets. *Id.* The officer stood over the plaintiff and shot the plaintiff nine more times at close range followed by stomping on the plaintiff's head multiple times. *Id.* As applied to this case, Plaintiffs fail to show how a delayed second shooting and stomping of an individual laying on the ground would put Campbell on notice that shooting at an approaching vehicle would be an unauthorized use of force. Therefore, the Court rejects this argument as well.

Rejecting Plaintiffs' arguments does not end the analysis because it is Campbell's burden to establish that he is entitled to qualified immunity. *Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005) ("the moving defendant bears the burden of proof on the issue of qualified immunity").[4] Upon review of the relevant authorities, the courts have addressed a spectrum of facts between an approaching vehicle that presents an immediate threat to an officer or others and a situation in which the vehicle is moving in a manner that does not present such a threat. For example, in *Sigley v. City of Parma Heights*, 437 F.3d 527 (6th Cir. 2006), the facts taken in the light most favorable to the plaintiff established that the officer in question was running either beside or slightly behind the driver's side window. *Id.* at 531. Although the officer was approximately two feet from

---

[4] Defendants assert that "Plaintiffs bear the burden of rebutting Officer Campbell's presumption of immunity." Dkt. 27 at 19. Defendants' fail to cite any authority for this "presumption," and the Court rejects the argument in light of the binding precedent.

the vehicle, the vehicle swerved away from the officer, and the plaintiff was shot in the back. *Id.* The court concluded that the officer was not entitled to qualified immunity reasoning as follows:

> viewing the facts in a light most favorable to the Plaintiff, [the officer] was running behind [the suspect's] car, out of danger, and [the suspect] drove in a manner to avoid others on the scene in an attempt to flee. Accepting these facts as true, [the officer] would have fair notice that shooting [the suspect] in the back when he did not pose an immediate threat to other officers was unlawful.

*Id.* at 537; *see also Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756 (2d Cir. 2003) (denying qualified immunity when submitted facts established officer was off to side of slow moving car and fired a second shot because he was trained to fire twice, not because he felt that he was in immediate danger).

On the other hand, "courts have held that the use of deadly force by an officer is reasonable in cases where the officer is standing in the path of an oncoming vehicle driven by a noncompliant suspect." *Rico v. Cty. of San Diego*, 09-CV-2684 BTM-WVG, 2013 WL 3149480, at *7 (S.D. Cal. June 18, 2013) (collecting cases). When presented with these factual situations, most courts have found in favor of the officer because the plaintiff failed to establish the violation of a constitutional right. In other words, the contours of the constitutional right have been clearly established such that the right does not encompass the freedom to drive a vehicle towards an officer threatening his safety.

Courts have also held that a plaintiff's right was not violated when the path of the vehicle and prospect of immediate harm are unclear. For example, in *Wilkinson v. Torres*, 610 F.3d 546 (9th Cir. 2010), the majority rejected evidence favorable to the

plaintiff to establish a factual scenario wherein an officer encountered a "'tense, uncertain, and rapidly evolving' situation . . . ." *Id.* at 551 (quoting officer's testimony). More importantly, the court stated that "the critical inquiry is what [the officer] perceived" when he used lethal force. *Id.* The court found that the officer perceived that his partner was either lying or standing in the path of an accelerating vehicle driven by a suspect that had repeatedly failed to follow commands. *Id.* at 551–53. Accordingly, the court held that the officer had cause to believe that his partner was in immediate danger and the use of lethal force did not violate the suspect's right. *Id.* at 553.

In between authorities addressing situations similar to *Wilkinson* and those addressing situations similar to *Sigley* is the "'hazy border between excessive and acceptable force.'" *Brosseau*, 543 U.S. at 201 (quoting *Saucier*, 533 U.S. at 206). Taking the facts in the light most favorable to Plaintiffs, the Court concludes that Campbell faced a scenario within this hazy borderland. It is undisputed that Campbell crossed in front of the suspect vehicle on his way to the passenger side of the vehicle. *See, e.g.*, Dkt. 40 at 6–7 (Plaintiffs conceding that Campbell "would inevitably have been in the path of the Salyers' vehicle for a second or two"). At this moment, Campbell declares as follows:

> When I was approximately 5-10 feet from the vehicle, at an approximately 45 degree angle off the front passenger corner of the car (and while I was still moving towards the car), the front end of the car lurched up and forward, as the car was accelerating, and the wheels turned directly towards me.

Campbell Dec., ¶ 10. Plaintiffs submit no evidence to contest Campbell's assertion that the vehicle accelerated and the wheels turned toward him while he was in the path of the

vehicle.  Instead, Plaintiffs rely on expert testimony to establish that Campbell was outside the path of and beside the vehicle when he fired.  This, however, is an improper analysis based on 20/20 hindsight.

For example, Scott opines that Campbell was "never in a position where his life was in danger . . . ."  Dkt. 41 at 96.  Although Scott fails to explain how being in the path of a moving vehicle driven by a person that is not following police commands is not dangerous, he apparently bases this opinion on the fact that Campbell was in a position "with at least 2 feet or more clearance between him and the passenger side of the vehicle . . . ."  *Id*. at 83, ¶ 7(D).  Even if there was two feet of clearance between Campbell and the vehicle, Plaintiffs fail to consider the gravity of a situation in which an officer is exiting the path of a vehicle that has turned toward him.  Moreover, Scott's analysis relies on Campbell making the split-second calculation that he has technically exited the turning arc of the vehicle, removing himself from an actual threat of immediate danger.  Contrary to Plaintiffs' position, this is the type of rapidly evolving, tense situation in which officers are afforded qualified immunity.  From Campbell's perspective, which is the proper perspective, he was in immediate danger even if he had technically just escaped danger.  Two feet is approximately one step.  Thus, Campbell was one step away from a vehicle that was not only moving but had also turned directly toward him.  In this scenario, Defendants have successfully shown that there was no clearly established law putting Campbell on notice that his use of lethal force was unconstitutional.

Similarly, the Court finds that Plaintiffs own experts support the split-second nature of the encounter and Campbell's decision to use deadly force.  Trevor Newberry

declares that the vehicle "started to move approximately 3 seconds before the fatal shot." Dkt. 28-1 at 33. Ronald Scott, Plaintiffs' ballistics expert, opines that "it takes an officer at least .83 seconds to recognize the threat and actually pull the trigger." Dkt. 45 at 8 (Defendants' reply referring to expert report). Based on these facts, Campbell had approximately two seconds to determine whether he was in immediate danger or whether the arc of the vehicle's path was such that he was safely out of the path of the vehicle. The Court finds that this evidence supports the conclusion that Campbell encountered an uncertain and rapidly evolving situation in which the recognition of clearly defined constitutional rights is difficult to assess. Therefore, Campbell is entitled to qualified immunity.

Plaintiffs raise three other issues that the Court must address. First, Plaintiffs take issue with the number of times Campbell shot at the vehicle. *See, e.g.*, Dkt. 40 at 20 ("When Campbell fired his last four shots the 'suspect' – Jackie Salyers – had driven past Campbell and thus she 'no longer pose[d] a threat' to him."). The evidence, however, establishes a continual shooting as opposed to two or more separate incidents of shooting. Plaintiffs fail to submit any authority for the proposition that the number of shots an officer uses in response to a threat is clearly established. In fact, the Ninth Circuit has ruled to the contrary. *Wilkinson*, 610 F.3d at 552–53 ("Because we conclude as a matter of law that deadly force was authorized to protect a fellow officer from harm, it makes no difference in this case whether Torres fired seven rounds or eleven."). Thus, the Court rejects Plaintiffs' argument.

Second, Plaintiffs contend that Campbell could have resorted to less intrusive alternatives. Dkt. 40 at 22–23. Again, Plaintiffs fail to submit any authority for the proposition that officers should not draw their weapons when confronting a violent criminal with outstanding warrants in the middle of the night. Moreover, the entire incident unfolded in a matter of seconds, and Plaintiffs have failed to establish that Campbell had sufficient time to consider a less intrusive alternative when the vehicle began moving and turned toward him. Thus, the Court rejects Plaintiffs' argument.

Third, Plaintiffs argue that the police officers' alleged destruction or spoliation of video evidence undermines "Campbell's credibility." Dkt. 84 at 15–16. The problem with Plaintiffs' argument is that they fail to establish that Campbell participated in or even knew of the alleged spoliation of the video evidence. In fact, Plaintiffs' claim based on this alleged spoliation is against officers Shafner, Nasworthy, and Taylor. Dkt. 88-1, ¶ 147. Thus, Plaintiffs fail to establish that the circumstantial or direct evidence of another officer deleting a video "would tend to discredit the police officer's story." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). Moreover, even if Plaintiffs establish that an officer deleted the video, it would remain unknown what the deleted video captured. In order to overcome summary judgment on qualified immunity, the video or circumstantial evidence would have to show that Campbell was so obviously clear of Sayler's vehicle that he should have known that deadly force was not authorized. To reach this conclusion, a reasonable fact finder would have to ignore the other circumstantial evidence, including Sayler's own expert. The Court finds that there is no authority for such a proposition. Circumstantial evidence that undermines an officer's credibility is

one circumstance that courts must address, but hypothetical and non-existent circumstantial evidence falls into the realm of speculation, which is insufficient to overcome summary judgment. While evidence of spoliation may support other claims, the Court rejects Plaintiffs' attempt to convert the alleged deletion of a video into a factual premise that creates a genuine issue of material fact precluding judgment on qualified immunity.[5] Therefore, the Court grants Defendants' motion on Plaintiffs' excessive force claims.

## C. Substantive Due Process

"The Supreme Court has made it clear . . . that only official conduct that 'shocks the conscience' is cognizable as a due process violation." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). "In determining whether excessive force shocks the conscience, the court must first ask 'whether the circumstances are such that actual deliberation [by the officer] is practical.'" *Wilkinson*, 610 F.3d at 554 (quoting *Porter*, 546 F.3d at 1137). "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience." *Id*. "On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Id*.

---

[5] If the matter proceeds on Plaintiffs' access to the courts claim and Plaintiffs submit evidence to establish that an officer deleted the video because it clearly showed that Campbell was not in danger when he used deadly force, then the Court may reconsider the qualified immunity issue. Plaintiffs, however, failed to request a Rule 56(d) continuance or deferral while they pursued such evidence.

1    In this case, Defendants move for summary judgment on Plaintiffs' substantive

2    due process claim.  Defendants argue that Plaintiffs have failed to submit any evidence

3    establishing that Campbell acted with deliberation or deliberate indifference.  Dkt. 27 at

4    19–23.  Plaintiffs counter that "[i]f the jury finds that the Plaintiffs' experts are correct

5    that Campbell was never in any danger of being run over, then the jury will conclude that

6    Campbell *never had a legitimate law enforcement objective*."  Dkt. 40 at 34.  This

7    argument, however, relies heavily on the 20/20 hindsight opinion that Campbell was at

8    least two feet out of the path of the vehicle when he began to fire his weapon.  Contrary

9    to Plaintiffs' position, the Court finds that Campbell made a split-second decision in an

10   escalating situation with the legitimate objective of protecting himself from what he

11   perceived was immediate, life-threatening danger.  As in *Wilkinson*, the situation here

12   escalated from identifying a suspect with multiple felony warrants to a moving car with

13   two officers on foot in a matter of seconds.  In these situations, the Ninth Circuit will "not

14   scrutinize as closely as the district court did [the officer's] decision about how best to

15   minimize the risk to his own safety and the safety of others."  *Wilkinson*, 610 F.3d at

16   554–55.  Therefore, the Court grants Defendants' motion on Plaintiffs' substantive due

17   process claims.

18   **D.    Negligence**

19        Plaintiffs assert state law negligence claims against Defendants.  Dkt. 1, ¶¶ 70–84.

20   Defendants move for summary judgment arguing that a negligence claim may not be

21   based on an intentional act such as Campbell's act of shooting Salyers.  Dkt. 27 at 23–27.

22   Plaintiffs counter that Defendants "ignore the fact that there are a plethora of other acts

upon which the negligence action in this case is based." Dkt. 40 at 26. Plaintiffs then

cite Campbell's failure to pass the tip from the informant to other law enforcement or

Campbell's failure to not harm an innocent bystander, Salyers, when taking a violent

criminal, Wright, into custody. Dkt. 40 at 26–31. Plaintiffs' complaint, however, is

limited to Campbell's negligent act of "shooting and killing Jacqueline Salyers . . . ."

Dkt. 1, ¶¶ 71, 74, 77, 80, 83. Thus, the Court agrees with Defendants that the explicit

language of the complaint limits the claims to Campbell's act of shooting Salyers. Under

this interpretation of the complaint, the majority of Plaintiffs' speculative arguments go

beyond the bounds of their claims and will not be addressed.

Within the claims, Plaintiffs argue that a jury could reasonably believe that

Campbell was shooting at Wright and negligently hit Salyers. The Court agrees with

Defendants that, to believe this story, a juror would have to reject Campbell's testimony

and construct an inference based on other evidence in the record. The Court finds that no

rational juror could reach this factual conclusion. Even if a court found this inference

rational, Plaintiffs concede that there are no "Washington cases involving liability for

making an arrest in a negligent manner which causes injury to a third party . . . ." Dkt. 40

at 29. Thus, Plaintiffs submit a few authorities from other jurisdictions that they contend

are persuasive. The Court disagrees with Plaintiffs because the authorities are easily

distinguishable in that they are based on *innocent bystanders*. Salyers was not an

innocent bystander and no reasonable juror could reach this conclusion. Salyers began to

drive a vehicle toward an officer against the commands of the officers. Plaintiffs have

provided no authority for the proposition that officers owe a duty to the driver of a

vehicle that places their lives in immediate danger.  Therefore, the Court grants

Defendants' motion on these claims as well.

**E.      Other motions**

There are two other pending motions, which are Plaintiffs' motion to expand

discovery, Dkt. 72, and Plaintiffs' motion for leave to amend, Dkt. 88.  The Court will

address these issues in a separate order.

## IV.  ORDER

Therefore, it is hereby **ORDERED** that Defendants' motion for summary

judgment, Dkt. 27, is **GRANTED** and Defendants' motion to exclude, Dkt. 25, and the

parties' motions in limine, Dkts. 61, 63, are **DENIED as moot**.

Dated this 28th day of March, 2019.


_____
BENJAMIN H. SETTLE
United States District Judge